W.M. (Bill) HENDON; Bill Hendon for Congress Committee; Peggy B. Hannah, Individually and on behalf of other voters of the Eleventh Congressional District of N.C., Plaintiffs,

and

U.S. Senator Jesse Helms; the N.C. Republican Party, David T. Flaherty, Chairman, Intervenor Plaintiffs,

v.

NORTH CAROLINA STATE BOARD of ELECTIONS, Robert W. Spearman, Chairman, and Elloree M. Erwin, Ruth T. Semashko, William A. Marsh, Jr., Robert R. Browning, Members of the N.C. State Board of Elections; Haywood County Board of Elections, Jim Francis, Chairman, and Tom Hart, Frank Queen, Members of the Haywood County Board of Elections; Henderson County Board of Elections, T.E. Mullinax, Jr., Chairman, Nicholas Semashko, Larry Justus, Members of the Henderson County Board of Elections; McDowell County Board of Elections, S.R. "Jack" Triplett, Chairman, and

Janet N. Norton, Walter W. Bill Rowe, Members of the McDowell County Board of Elections; Rutherford County Board of Elections, James H. Burwell, Chairman, J.D. Cooley, Bill Penson, Members, Rutherford County Board of Elections; Transylvania County Board of Elections, John R. Hudson, Chairman, William C. Mann, Henry R. Crais, Members, Transylvania County Board of Elections, Defendants.

Civ. A. No. A–C–82–357.

United States District Court,
W.D. North Carolina,
Asheville Division.

April 16, 1986.
Supplemental Opinion May 5, 1986.

---

Robert F. Orr, Asheville, N.C., Miller, Canfield, Paddock & Stone by James F. Schoener, Washington, D.C., for plaintiffs.

Maupin, Taylor & Ellis by Armistead J. Maupin, Thomas A. Farr, Raleigh, N.C., for intervenor plaintiffs.

James W. Wallace, Jr., Deputy Atty. Gen. for Legal Affairs, Raleigh, N.C., for defendants.

## MEMORANDUM OF OPINION

SENTELLE, District Judge.

THIS MATTER is before the Court on cross motions for summary judgment. Twice before the case has been before this

Court and twice before the Court has entered orders apparently dispositive but which were appealed with resultant remands.[1] This opinion must necessarily contain a review of these prior proceedings in order to sensibly dispose of the issues now raised by the motions for summary judgment.

This case first arose between the Congressional election of 1982 and the seating of the congressmen elected therein. The original plaintiffs were William M. (Bill) Hendon, the incumbent Republican Congressman from the 11th District of North Carolina, his congressional campaign committee and Peggy B. Hannah who purported to sue individually and on behalf of other voters of the 11th Congressional District. The original defendants were the North Carolina Board of Elections, its members and the county boards of certain counties in the 11th District, together with their individual members. Thereafter, James G. McClure Clark, the Democratic candidate (successful) for the 11th District seat, intervened as a party defendant.[2]

Clark had defeated Hendon in an extremely close contest.[3] Plaintiff sought to set aside the results of the election, to obtain a recount, and to declare unconstitutional certain sections of the North Carolina election laws set forth in N.C. Gen. Stat. § 163–151(4), (5), and (6), 163–170(5) and (6) (1982).[4] In brief summary the plaintiffs attacked North Carolina Statutes concerning the counting of ballots on which voters had attempted to vote a straight ticket but had "crossed over" and cast or attempted to cast a vote for an individual candidate of the opposite party in a particular contest. Under the then prevailing North Carolina law a paper ballot so marked was counted with reference to the contest of attempted crossover as a ballot for the candidate of the party marked at the top of the ballot in the "straight ticket" space. The District Court held this procedure not to be violative of any constitutional rights and granted plaintiffs no relief. The Fourth Circuit reversed holding that "the imposition of a legislative preference for the straight party candidate when the voter has indicated no such preference, is an arbitrary subversion of the electoral process that serves no compelling state interest." *Hendon I* at 180.

Plaintiffs' second contention involved a difference in the methods of counting such attempted split ballots on different types of voting machines. At that time North Carolina counties not using traditional paper ballots employed three different types of voting machines. In some counties [5] election officials used mechanical voting machines; in others, Airmac Systems and in others, CES (electronic punch card) machines. On the mechanical machines the voter could cast a straight party vote, flip a separate lever with reference to any individual race and cancel his straight vote so as to cast a vote for a candidate of another party. On the Airmac and CES machines these attempted crossovers were not counted and were tallied instead as votes for the

---

1. In each of the prior district court appearances, the Honorable Woodrow W. Jones, United States District Judge (now Senior Judge) presided.

2. Senator Helms, The North Carolina Republican Party and its Chairman were permitted to intervene as plaintiffs after the first remand.

3. A swing of 621 votes out of 171,047 votes cast or less than .4 of 1% of the total would have reversed the result of the election.

4. While the relevant statutes have previously been dealt with in opinions of this Court (see Appendices A and B) and of the Fourth Circuit [*Hendon v. N.C. State Board of Elections*, 710 F.2d 177 (4th Cir.1983) (*Hendon I*) and *Hendon v. N.C. State Board of Elections*, No. 84–1687 (4th Cir.1985) (unpublished per curiam, see Appendix C) (*Hendon II*)], an understanding of the issues before the Court in the prior decisions is necessary to a clear understanding of the disposition of the present motions. Therefore, the text of the relevant statutes is set forth as Appendix D to this opinion.

5. And in some precincts within other counties.

straight party marked at the top of the relevant voting card. Again, the District Court found this procedure not to be unconstitutional and again the Fourth Circuit reversed. The Circuit found that this distinction placed a more onerous burden on voters in counties with the latter two types of counting systems than in those counties using the mechanical machines and remanded finding N.C.Gen.Stat. § 163–151(5)(a) not facially unconstitutional but possibly "unconstitutionally applied if (a) the CES and Airmac systems can be programmed to record split tickets in substantially the same manner as voting machines and (b) the state offers no rational explanation for requiring voters who are furnished the CES and Airmac systems to suffer a much more onerous burden than voters who are furnished voting machines." The remand also directed the Court to consider the nature of other relief in light of the Circuit Court's opinion. *Hendon I*, at 183.

The District Court in its second opinion (Appendix B) found that the two questioned machines could be so programmed and made other findings which will be discussed in the body of this opinion. The Court then ordered the programming of all machines "to count crossover voters for individual candidates on those ballots on which the voter has marked or punched a straight party ticket and has also marked or punched an individual crossover vote." (Appendix B.)

Defendants again appealed. The Fourth Circuit found no error in the district judge's findings of fact or conclusions of law, but remanded the case for further consideration in light of a change in North Carolina law, specifically the enactment of House Bill 1796, Chapter 1099, Session Laws of 1983 (regular session 1984).[6] *Hendon II*, at 8. It is in this context that both parties now move the court for summary judgment, the plaintiff alleging the unconstitutionality of the new statute under the

prior opinions and the defendant denying that unconstitutionality and asserting the control of that act upon this case.

## I

Before reaching the merits of the claims concerning the constitutionality and effectiveness of the statute, this Court must address a threshold question raised by plaintiffs as to the propriety of this question even being before the Court. A resolution of the North Carolina State State (sic) Board of Elections dated August 8, 1985 directed the Attorney General of North Carolina to "confess judgment that House Bill 1796, Chapter 1099, is unconstitutional under the Fourteenth Amendment of the United States Constitution."[7] The Attorney General responded and asserts on behalf of defendants that "I consider my primary responsibility to be that of defending the enactments of our General Assembly, whose laws are presumed to be constitutional, unless and until declared otherwise by a court of competent jurisdiction." Therefore, the first issue joined is whether a state agency represented by the Attorney General of North Carolina has the authority to direct that attorney general to enter a confession of judgment of the sort here proposed. Conversely, the issue can be stated: Does the Attorney General of North Carolina representing a state agency have the power to reject his client agency's directive to enter into such a judgment by confession and continue the litigation?

In support of an affirmative answer to the first formulation of the issue and a negative answer to the second, plaintiffs cite the case of *Tice v. Department of Transportation*, 67 N.C.App. 48, 312 S.E.2d 241 (1984). In that case, which plaintiff argues is controlling, the attorney general, acting through an assistant attorney general, entered into a consent judgment establishing the boundaries of a state

---

6. Appendix E. For reasons not apparent to the Court, this session law has not been codified in the North Carolina General Statutes.

7. The resolution is included as Appendix F to this opinion.

road and enjoining the plaintiff from interfering with the maintenance and public use of the road. Subsequently, the Department of Transportation repudiated the consent judgment and moved to set aside the judgment and the stipulations upon which it was based. This motion was based in principal part on the proposition that the attorney general "was without authority from the [client agency] ... to execute the consent judgment on its behalf." In that case, as in the case at bar, the attorney general's appearance as counsel was pursuant to N.C.Gen.Stat. § 114–2(2) which provides that a duty of the attorney general is to "represent all state departments, agencies, institutions, commissions, bureaus or other organized activities of the state which receive support in whole or in part from the state."

The State Court of Appeals in affirming an order allowing the Department of Transportation's motion held that the statute and representations pursuant to it created a traditional attorney-client relationship and "generally, an attorney cannot enter a consent judgment without the consent of his client." Reiterating existing North Carolina law established in an action on behalf of the town of Bath wherein the town had voided a consent judgment entered by the town's attorney, the Court stated, "[A]bsence of authority to consent ... deprive[s] the judgment of any sort of validity." *Bath v. Norman,* 226 N.C. 502, 504, 39 S.E.2d 363, 364 (1946). Plaintiff argues that the situation before this court is directly analogous to the situation in *Tice* and that therefore the State Board of Elections, as client agency, has the authority to settle this litigation and that the attorney general has none to oppose that settlement.

This analysis, however, does not go deeply enough into the reasoning of the North Carolina Court. In addressing the specific facts before it as to whether or not the attorney general had the authority to enter a consent judgment on behalf of a state department without that department's consent, the Court cautioned, "This situation must be distinguished from situations in which the attorney general is prosecuting an appeal or in which he brings an action on behalf of the state. The general rule in those situations is that the attorney general has control of the action and may settle it when he determines it is in the best interests of the state to do so." *Tice, supra,* 67 N.C.App. at 51, 312 S.E.2d at 243.

A state department's authority therefore is not plenary nor is the attorney general's role as limited as that of an attorney for an ordinary litigant.[8] As the United States District Court for the Eastern District of North Carolina has noted:

> The United States Court of Appeals for the Fifth Circuit has observed that, '[t]he office of Attorney General is older than the United States.' *Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 268 (5th Cir.1976), *cert. denied,* 425 U.S. 930, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976). The Court went on to note that: '[A]ttorneys general of our states have enjoyed a significant degree of autonomy. Their duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the attorney general of specific powers; but in the absence of such legislative action, he typically may exercise all such authority as the public interest requires.' Because the common law is in full force and effect in North Carolina, see N.C. Gen.Stat. § 4–1, and bearing in mind the axiom that statutes in derogation of the common law must be strictly construed, *see Swift & Co. v. Tempelos,* 178 N.C. 487, 101 S.E. 8 (1919), the Court must resolve any ambiguity in North Carolina

---

8. *Cf. State v. Britt,* 288 N.C. 699, 220 S.E.2d 283 (1975); *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), with reference to the analogous role of the prosecutor in criminal actions.

statutory provisions defining the reach of the Attorney General's authority in favor of a broader scope consistent with the common law. *Nash County Board of Education vs. Biltmore.* 464 F.Supp. 1027 (E.D.N.C.1978), aff'd. 640 F.2d 484 (4th Cir.1981).

The attorney general of North Carolina is a constitutional officer, Const. of N.C., Art. III, Section 7(1). He is required to take an oath which among other things binds him to "support, maintain and defend the constitution of [North Carolina] not inconsistent with the constitution of the United States ..." N.C.Gen.Stat. § 11–7. It is but a small step from the language of his oath to the proposition asserted by the attorney general in this case that his duty includes the defense of statutes of his state against charges of unconstitutionality.

All the *Tice* case does is state that N.C. G.S. § 114–2 does not "authorize the attorney general or his staff to concede a substantial right of a state agency as to a matter which the general assembly has placed within the agency's authority and discretion." [9]

That *Tice* reasoning is simply not applicable to the case at bar. *Tice* and the cases it relies on involve settlements of money matters, property rights and other quasi-private rights of state agencies, which the legislature has no doubt entrusted to the authority and discretion of an agency. The instant case, however, involves the constitutionality of a state statute and this can hardly be said to be a matter which the legislature has entrusted to the authority and discretion of appointed officials to the exclusion of its chief constitutional legal authority. The *Tice* decision is in part underpinned on reasons of public policy stated briefly as follows:

The governor is a constitutional officer elected by the qualified voters of the state. .... The executive power of the state is vested in him, ... and he has the duty to supervise the official conduct of all executive officers.... The attorney general is a constitutional officer elected independently of the governor ...; is the head of the department of justice ...; and has the duty to supervise that Department's activities. *Tice, supra,* 67 N.C.App. at 55, 312 S.E.2d at 245.

The *Tice* court then goes on to reason that permitting the attorney general to resolve without the agency's consent litigation controversies would be derogative of the governor's constitutional duty to exercise his executive power and that the general assembly could not have intended to create such potential erosion of the governor's authority. The same reasoning in the instant case cuts in the opposite direction. To permit state agencies to independently determine the constitutionality of acts to the exclusion of the attorney general would effectively undermine the lawful authority of the attorney general. Therefore, the attorney general is within his authority to take the position he has taken in this case, and he is not bound by the Board's direction to the contrary.

## II

However, to conclude that the attorney general has the authority to act as he has in this case is not to conclude that he is correct in the position he has taken. The principal question now before the Court for decision concerns the constitutionality of the new North Carolina Statute (Appendix E). Since the materials offered by the attorney general in support of defendants' motion for summary judgment and in opposition to plaintiff's motion for summary judgment offer nothing new to support the constitutionality of the statute, the prior opinions of this Court and the Fourth Circuit compel a holding that it is not constitutional and therefore, the allowance of plaintiffs' motion for summary judgment.

In *Hendon I* the Fourth Circuit reversed this Court and held the North Carolina Statutes § 163–151(6)(b) and 163–170(6)(a)

9. This quotation is drawn from the attorney general's brief in *Tice, supra.*

(Appendix D) unconstitutional in that the statutes which provided for the counting of straight ticket votes to the exclusion of simultaneous crossover votes served no compelling interest and therefore were unconstitutional, citing *Melchoir v. Todman*, 296 F.Supp. 900 (D.V.I.1968), and *Murchie v. Clifford*, 76 N.H. 99, 79 A. 901 (1911). The Court concluded the legislative preference for the straight-party candidate over the crossover candidate was an arbitrary subversion of election process. The Fourth Circuit in its opinion recognized that the "constitution protects the right of qualified citizens to vote and have their vote counted as cast." *Hendon* I at 180. Then, citing *Murchie*, the Fourth Circuit held that while the legislature may enact the method by which a citizen shall vote, it cannot direct how that vote shall be counted. *Hendon* I at 180. The court then concluded that this legislative preference violated the voters' and opponents' of the straight-party ticket equal protection rights.

The Fourth Circuit, in considering whether the different methods of voting involving the CES and Airmac systems (that would not count crossover votes) on the one hand and the mechanical voting machine (where the voter could register a crossover vote) on the other hand violated due process by placing an unconstitutional burden on the voter, remanded the case back to the district court for additional findings of fact. The Court noted that voters on CES and Airmac systems had to vote for as many as 51 individual candidates to split a ticket while the other two methods used allowed a voter to do so with no such difficulty.

The Fourth Circuit held that while a state may employ diverse methods of voting, where these methods vary throughout the state, a state may not place onerous burdens on the voter's exercise of his right to vote. *Hendon I* at 181. Furthermore, there must be a rational basis for placing a greater burden on one voter than another. *Hendon I* at 181.

In remanding the case the Fourth Circuit said:

The district court should also determine whether the CES and Airmac systems can be programmed to accommodate split tickets in substantially the same manner as North Carolina's voting machines. If this can be done, the state should be afforded an opportunity to present its reason for treating voters who use voting machines differently from those who use the CES and Airmac systems. With this factual information at hand, the district court should determine whether § 163–151(5)(1) is being unconstitutionally applied.

We leave the nature of other relief to the sound discretion of the district court. It may be appropriate to require the officials to treat the dual votes for a single office as void. As we have noted, there is precedent for this course of action. *Conversely, further proof may show that the integrity of elections can be maintained if the dual vote is treated as a vote for the individual candidate whom the voter has designated and all candidates on the designated straight-party ticket, except the opponent of the individual candidate the voter favored. This would appear to recognize the intent of the voter, and it would be compatible with the counting of votes cast on machines. Id.* at 183. (Emphasis added.)

On remand this Court made the following findings of fact:

1. That CES, Airmac, and GDS vote-counting machines now approved for use in the State of North Carolina by the defendant North Carolina State Board of Elections can be programmed in substantially the same manner as those Shoup and AVM mechanical voting machines were set and operated during the 1982 General Election in the State of North Carolina to count those ballots on which the voter has marked or punched a straight-party ticket and has also marked or punched an individual crossover vote.

2. That the State of North Carolina offered no evidence that voters who use CES, Airmac, or GDS voting machines should be treated differently from those voters who used mechanical voting machines as they were programmed to operate in the 1982 General Election.

3. That the integrity of elections can be maintained if a dual vote made on any ballot counted on CES, Airmac, or GDS vote-counting machines is counted as a vote for the individual candidate whom the voter has designated and all candidates on the designated straight-party ticket except the opponent of the individual candidate the voter favors. *This recognizes the intent of the voter* and is compatible with the counting of votes on mechanical voting machines. *Hendon* (App. B) (emphasis added).

Based on these findings and the law that the Fourth Circuit cited in its opinion, this Court entered judgment that this statute, § 163-151(5)(a), was unconstitutional and entered an order directing the defendants in future general elections to program CES, Airmac, and GDS voting machines in substantially the same manner as Shoup and AVM mechanical voting machines were programmed during the general election of 1982. *Hendon*, A-C-82-357, at 3.

Defendants appealed to the Fourth Circuit on these findings. The Fourth Circuit in *Hendon*, 84-1687 (July 3, 1985), affirmed these findings and the conclusions of law. However, the Fourth Circuit remanded the case back to this Court to consider what effect House Bill, Appendix E, which was enacted in the interim, had on the issues therein.

That statute states that after March 1, 1985, these dual crossover votes shall be deemed void. This is in direct conflict with the order from this Court compelling the state to count these votes throughout the state by reprogramming the machines.

At the top of the Bill, it states: "AN ACT TO PUT NORTH CAROLINA IN COM-PLIANCE WITH A FEDERAL COURT DECISION CONCERNING STRAIGHT TICKET VOTING." This bill is the legislature's answer to *Hendon I*, after which the legislature could no longer prefer a straight ticket vote to a crossover vote. The reasoning offered by the attorney general in support of the bill is based on the decisions in *Melchoir* and *Murchie, supra.* In *Murchie v. Clifford, supra,* the Supreme Court of New Hampshire struck down legislation requiring a straight party vote to be counted to the exclusion of crossover votes. The *Murchie* court concluded:

> Taking the ballot as a whole, it appears that the voter has expressed or attempted to express a choice of two persons for one office. *It being impossible to determine which of those two was the one the voter thought he had voted for* as the statute requires [citations omitted] the ballot cannot be counted for either. 76 N.H. at 107; 79 Atlantic at 904. (Emphasis added.)

Defendants also cite *Melchoir v. Todman, supra,* where the court held that multiple votes for the same office be voided instead of legislatively enacting preference between the two votes *"where the voter has failed to indicate his own."* 296 F.Supp. 902. (Emphasis added.)

Both of these cases are decided on the finding that voter intent could not be found. The court held that it would be arbitrary to apply any intent where there was none indicated. The courts concluded that the vote should be voided. While this seems on par with the case at hand, it is quite distinguishable.

The Fourth Circuit, when leaving the disposition of the remedy to this court, said that it may be appropriate to void these votes or "[c]onversely, further proof may show that the integrity of elections can be maintained if the dual vote is treated as a vote for the individual candidate whom the voter has designated and all candidates on the designated straight party ticket, except

the opponent of the individual candidate the voter favored."

■■■ This alternative is just what the Court found as fact in *Hendon*, Appendix B, in Finding of Fact 3. The Fourth Circuit expressly affirmed this Court in *Hendon II*, holding, "We find no error in these findings of fact and conclusions of law of the district judge." *Hendon II*, App. C at 8. Plainly, it is now the law of the case that the counting of the crossover vote rather than the straight ticket reflects the intent of the voter. Under the law of the case doctrine, any determination as to an issue in the case which has previously been determined by the district court and affirmed by the court of appeals is now binding upon the parties, as well as the district court. *Stonega Coke and Coal Company v. Price*, 116 F.2d 618, 621 (4th Cir.1940); *accord Lytle v. Commission of Election of Union County*, 541 F.2d 421, 425, n. 8 (4th Cir.1976), *cert. denied* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Capital Investors Co. v. Executors of the Estate of Morrison*, 584 F.2d 652, 654 (4th Cir.1978), *cert. denied* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). This is precisely the status of the finding of fact of this Court set forth in Finding Number 3 of Appendix B. Since voter intent can be determined with these crossover votes, the voter has a constitutional right to have his vote counted as cast. *Hendon*, 710 F.2d 177 (1983), citing *Reynolds v. Simms*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). Indeed, it is difficult to see what other intention the voter could possibly have in seeking out one of fifty-one (51) individual contenders to mark on his ballot when the simple expedient marking of the top slot in the ballot and leaving all others unmarked would have accomplished the only other possible intent. The state must show a compelling state interest to circumvent this clear intent. *Id.* at 180, citing *Dunn v. Blumstein*, 405 U.S. 330, 336–37, 92 S.Ct. 995, 999–1000, 31 L.Ed.2d 274 (1972). The compelling state interest set forth by the state is that this voiding will do away with votes where the intent is not clear and where legislative preference

should not be applied. However, there is no need to void the vote where there is no confusion as to which candidate the voter cast his vote for. It would appear that the Bill could have been more accurately titled "AN ACT TO CIRCUMVENT A FEDERAL COURT DECISION CONCERNING STRAIGHT TICKET VOTING."

This Bill then does not survive the scrutiny that is called for under *Hendon I*. There exists no compelling state interest that would allow the state in effect to refuse to recognize a legitimate vote made where the clear intent is found. To do so would force voters to split their ticket to vote for each individual candidate (in this election 51) or to vote a straight ticket. This is too large a burden to place on a voter when the vote can be counted with ease and assurance of voter intent as a crossover vote.

■■■ House Bill 1796, Chapter 1099, then fails to withstand the constitutional challenge put forth by the plaintiffs. The order compelling the Election Board to program the machines to count crossover votes stands as this Bill is unconstitutional in that it unreasonably interferes with one's right to have his vote counted as cast for no compelling state reason.

Based on the foregoing, the Court finds that House Bill 1796, Chapter 1099, is unconstitutional.

The Court would close this opinion with the hope, perhaps sanguine, that this litigation is now over. By order filed simultaneously with this memorandum, the Court reaffirms the prior directives of Judge Jones to the end of determining North Carolina's electoral contest at the ballot box rather than the federal bench.

## APPENDIX A

Plaintiffs bring this action pursuant to Civil Rights Statutes, 42 U.S.C.A. Sections 1983 and 1985 and the Voting Rights Statutes, 42 U.S.C.A. Sections 1971 and 1973 for alleged violations of the equal protection and due process clauses of the Fifth

and Fourteenth Amendments of the United States Constitution. They contend that North Carolina General Statutes 163–140, 151 and 170 and the method of counting straight party and crossover or split ticket votes provided for in the statutes are unconstitutional. In addition, they contend that the form of the ballots in five western North Carolina counties for the November 2, 1982 general election failed to comply with state law and is unconstitutional. This action arises out of the November 2, 1982 Congressional election in which Democrat James McClure Clarke defeated incumbent Republican W.M. (Bill) Hendon and Libertarian Linda Janca for the Eleventh Congressional District of North Carolina. This Court has jurisdiction pursuant to 28 U.S.C.A. Section 1343 and 42 U.S.C.A. Section 1971.

The Plaintiffs are W.M. (Bill) Hendon, the incumbent Republican Congressman from the Eleventh District, the Bill Hendon for Congress Committee, and Peggy B. Hannah, individually and on behalf of other voters of the Eleventh Congressional District of North Carolina. The original Defendants are the North Carolina State Board of Elections and its individual members and the County Boards of Elections for Haywood, Henderson, McDowell, Rutherford and Transylvania Counties and their individual members. By an order dated November 18, 1982, the Court allowed James McClure Clarke to intervene as a party defendant.

Plaintiffs seek declaratory and injunctive relief asking the Court to declare N.C.G.S. 163–140, 151, 170 unconstitutional and order a manual recount of all ballots. On November 22, 1982, the Court entered a temporary restraining order staying and enjoining the certification of the results of the November 2, 1982 general election for member of the United States House of Representatives for the Eleventh District of North Carolina for 15 days. The matter is presently before the Court for adjudication upon the merits.

After a careful consideration of the pleadings, evidence, briefs and arguments of counsel, the Court now enters its findings and conclusions.

The Eleventh Congressional District of North Carolina is comprised of sixteen and one-third counties. In the November 2, 1982 election, voters in these counties voted and had their votes counted by one of four methods: (1) the traditional hand counted paper ballot; (2) the mechanical lever voting machine; (3) the electronic computer punch and count system called CES; and (4) specially marked paper ballots counted by an optical scanner system called Airmac. The traditional hand counted paper ballot listed the Congressional race on a separate sheet of paper containing only the three Congressional candidates. Plaintiffs do not challenge this system of voting. The mechanical lever voting machines allow a voter to pull a lever to vote a straight party ticket then manually manipulate other levers to reject the choice of one or more candidates under the straight party column and to vote for candidates of another political party. After voting, the voter pulls a lever that registers his votes in the machine as he cast it. Plaintiffs do not challenge this system of voting.

The Airmac system of voting is challenged by Plaintiffs. It was used in Henderson County, all Transylvania precincts except three, and seventeen precincts of Haywood County. The ballots consist of a single slip of paper with instructions at the top of the front of the ballot stating:

### INSTRUCTIONS TO VOTER

a. To vote for all candidates of one party (a straight ticket), fill in the box at the right of the party for whose candidates you wish to vote.

b. To vote for candidates of more than one party (a split ticket), do not mark in any party box, but fill in the box at the right of the name of each candidate for whom you wish to vote.

c. If you should fill in the box at the right of one of the parties at the top of the ballot and also fill in the box at the right of the name of any candi-

date of any party, your ballot will be counted as a straight ticket vote for all of the candidates of the party whose box you filled.

d. If you tear or deface or wrongly mark this ballot, return it and get another.

On the Airmac ballot, the candidates for the various offices are grouped together for their respected races on one ballot. The first choice for the voters is "Straight Party Ticket" followed by the Congressional ticket. The ballots are marked with special pens and manually fed through an automatic optical scanning reader. The optical scanning reader was programmed so that if a voter voted a straight party ticket at the top and then specifically voted for an individual of another political party in the Congressional race, the vote would be counted for the candidate of the straight party and not for the individual candidate for whom the voter also voted. A voter could vote straight party ticket and make a write-in vote for Congress as long as the name written in was not the candidate of another party, and the write-in vote was in the same straight party column as previously voted.

The CES punch card system was used in McDowell and Rutherford Counties. The ballot is inserted into the voting machine underneath an eight page booklet containing the candidates grouped together in their respective races and with the instructions printed on the front page. The voter punches the ballot card beside the party or candidate of his choice. The pertinent portion of the instructions reads

## IMPORTANT

## ALL VOTERS READ BEFORE VOTING

1. You may vote a straight party ballot or you may vote for each individual candidate regardless of party.

2. To vote straight party you turn to Page 1 and punch a straight ticket opposite the political party of your choice. If you vote a straight party ballot then you cannot vote for each individual candidate EXCEPT on Page 7 where Non-Partisan officers are listed and Constitutional Amendments on Page 8.

3. If you wish to vote for candidates of more than one party you should begin voting on Page 2.

If an individual punched the straight party slot and also punched the slot for an individual Congressional candidate of another political party, the vote would be recorded for the straight party candidate.

The official election returns gave Clarke 85,410 votes, Hendon 84,085 votes and Janca 1,552 votes. Plaintiff Hendon challenged the results in Henderson, Transylvania, Haywood, McDowell and Rutherford Counties and requested recounts. Plaintiff Hendon contends that a substantial number of persons in those counties using the Airmac or CES machines, voted a straight Democratic ticket and for him but that these votes were counted for the straight Democratic ticket candidate, Clarke. Each of the County Boards of Elections denied Hendon's petitions. The Transylvania Board of Elections in denying Hendon's petition specifically found that ballots were marked both straight Democratic and for the Republican Hendon. On November 23, 1982 the Defendant State Board of Elections denied Hendon's appeal and affirmed the County Boards of Elections denial of request for recount.

Defendants Boards of Elections defend their action in counting the straight party vote over the individual vote for a different party candidate on the basis of N.C.G.S. 163–170. N.C.G.S. 163–170 entitled "Rules For Counting Ballots" reads in pertinent part:

(6) Split Ticket.—

a. If the voter has marked the party circle of one party and also marked the voting square of individual candidates of another party, the ballot shall be counted as a straight ballot and counted as a vote for every candidate for the party whose circle has been marked.

b. If the voter votes a split ticket by omitting to mark the party circle and marks the voting square opposite the name of candidates for whom he desires to vote in different party columns, the ballot shall be counted as a vote for each candidate marked in a different party column.

(7) Voting a Straight Ticket.—If a voter desires to vote for all candidates of one political party, a straight ticket, he shall either:

a. Mark the party circle printed at the top of the party column; or

b. Mark the voting squares at the left of the name of every candidate of the same party printed on the ballot; or

c. Mark the party circle and also mark some or all names printed in that party column.

In either case, the ballot shall be counted as a straight ticket and counted as a vote for every candidate whose name is printed in the party column.

Defendants also rely on N.C.G.S. 163–151 "Marking ballots in primary and election."

(4) Straight Ticket.—In an election, but not a primary, if the voter desires to vote for all candidates of one political party (a straight ticket), he shall either:

a. Mark the party circle printed above the party column; or

b. Mark in the voting square at the left of the name of every candidate printed on the ballot in the party column for whom he desires to vote; or

c. Mark the party circle and also mark some or all names printed in that party column.

(5) Split Ticket.—In an election but not in a primary, if the voter desires to vote for candidates of more than one political party (a split ticket), he shall:

a. Omit marking in the party circle of any party and mark in the voting square opposite the name of each candidate of any party printed on the ballot for whom the voter wishes to vote.

b. If the voter should mark the party circle of one party, and also mark the voting square opposite the name of candidates of any other party, the ballot shall be counted as a straight ticket for all candidates of the party whose circle was marked and the individually marked candidates of any other party shall not be counted.

The Defendants first argue that this Court should refuse to hear this case because of the principles of abstention set forth by the Supreme Court in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed.2d 971 (1941). The *Pullman* doctrine authorizes abstention when a federal court faces a constitutional challenge which is intertwined with an ambiguous issue of state law and there is a likelihood that clarification of state law will moot or substantially alter the federal question. See *Palmer v. Jackson*, 617 F.2d 424 (5th Cir.1980). "[A]bstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim." *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967).

This Court finds that this is not an appropriate case for abstention. The state statutes at issue are clear and unambiguous. The Supreme Court has "frequently emphasized that abstention is not to be ordered unless the state statute is of uncertain nature, and is obviously susceptible of a limiting construction." *Zwickler v. Koota*, 389 U.S. at 251 n. 14, 88 S.Ct. at 397, n. 14. The statutes and their application are challenged as violative of federal civil and constitutional rights. It would defeat the purpose of the Civil Rights Acts and the Voting Rights Acts if the "assertion of a federal claim in federal court must await an attempt to vindicate the same claim in state court." *McNeese v. Board of Education*, 373 U.S. 668, 673, 83 S.Ct. 1433, 1436, 10 L.Ed.2d 622 (1963). It is imperative that the issues raised in this cause be decided on an expedited basis because the new Congress convenes in early 1983. The Court will not abstain from considering the merits of Plaintiffs' claims.

Plaintiffs assert that N.C.G.S. 163–151 and 170 are unconstitutional as a violation of equal protection of the law. They argue that voters using the Airmac and CES machines could not vote a straight party ticket then "crossover" to vote for an individual candidate of another party for Congress while voters using the traditional hand counted paper ballots and the mechanical lever machines could make such a "crossover" vote. The second aspect of the equal protection attack is that N.C.G.S. 163–151(6) and 163–170(5) [1] count write-in votes for candidates not listed on the ballot even though the voter has marked the straight party circle while N.C.G.S. 163–151(4) and (5) and 163–170(6) and (7) deny the effect of the affirmative act of voting for the individual candidate of another party.

Plaintiffs brought this action under 42 U.S.C.A. Sections 1983 and 1985. These statutes provide a remedy for deprivation of rights "secured by the Constitution and laws of the United States" by persons acting under color of state law. There is no doubt that Defendants, except Clarke, were acting under color of state law in preparing the ballots and in counting the votes cast. Thus the inquiry is whether Plaintiffs have been deprived of a right "secured by the Constitution and laws" of the United States. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. at 2689, 2692, 61 L.Ed.2d 433 (1979).

The purpose of the Equal Protection Clause of the Fourteenth Amendment is to prevent arbitrary and invidious discrimination against or treatment of persons in like circumstances by state action. *Wash-*

**1.** N.C.G.S. 163–151 states in part:

(6) Write-In Votes.—

a. In an election but not in a primary, if a voter desires to vote for a person whose name is not printed on the ballot, he shall write in the name of the person in the space immediately beneath the name of a candidate, if any, printed on the ballot for that particular office. The voter shall write the name himself unless he is entitled to assistance under G.S. 163–152, in which case the person giving assistance may write in the name at the request of the voter.

b. The voter should not write in a name of a person whose name appears as a candidate of a political party. If the voter writes in the name of a candidate printed on the ballot of any party, the write-in shall not be counted.

c. If the voter has marked the party circle of one political party, he may also write in the name of a person for whom he wishes to vote beneath the name of a candidate printed in the same column whose party circle he has marked.

d. If the voter has marked the party circle of one party, he should not write in the name of a person under the name of a candidate in any other party. In such case, the write-in shall not be counted, but the ballot shall be counted for all candidates of the party whose circle was marked.

e. No voter shall write the name of any person on a primary ballot.

N.C.G.S. 163–170 reads in pertinent part:

(5) Write-In Votes.—If a name has been written in on an official general election ballot as provided in G.S. 163–151, it shall be counted in accordance with the following rules:

a. The name written in shall not be counted unless written in by the voter or a person

authorized to assist the voter pursuant to G.S. 163–152.

b. The name shall be written in immediately below the name of a candidate for a particular office, if any, and shall be counted as a vote for the person whose name has been written in for that office. If the voter has made a mark to the left of the name written in, or checked in the party circle or the square beside the name of a candidate below whose name the write-in appears, or if the voter strikes out, marks through or crosses out the name printed above the write-in, such action by the voter shall not serve to invalidate the ballot or the vote for the person whose name was written in for that particular office.

c. If the person whose name was written in appears as a candidate of a political party for any office, the write-in shall be ignored and the ballot shall be counted as though no write-in appeared for such office.

d. Marking Party Circle and Write-Ins.—

1. If the voter marks the party circle above the column in which he has entered the write-in, his ballot shall be counted as a vote for the person whose name has been written in, and for all other candidates of the party in whose circle he has marked, except the candidate beneath whose printed name the write-in appears.

2. If the voter has marked the party circle at the top of the column of a political party, and has made a write-in under the name of a candidate printed in a column of a different political party, the write-in shall not be counted, and the ballot shall be counted as a vote for all candidates of the party in whose circle he has marked.

*ington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Different treatment of persons similarly situated may be justified if such treatment is reasonably related to a legitimate government interest, and is not based upon invidious discrimination or a suspect classification. *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). State laws are generally entitled to a presumption of validity against attack under the Equal Protection Clause. *Town of Lockport v. Citizens For Community Action*, 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977).

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Qualified citizens not only have a constitutionally protected right to vote, *Ex parte Yarborough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), but also the right to have their votes counted, *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), a right which can neither be denied outright, *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), nor destroyed by alteration of ballots, *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) nor diluted by ballot box stuffing. *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 85 L.Ed. 1341 (1944). The Supreme Court has repeatedly made the reason for such constitutional protection clear:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government ...
>
> "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

Undoubtedly, the right of suffrage is a fundamental matter in a free and dem-

ocratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. at 555–62, 84 S.Ct. at 1378–81 [Quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964) ].

However, the States have broad powers to determine the conditions under which rights of suffrage may be exercised, provided there is no invidious or arbitrary discrimination between individuals in violation of the equal protection afforded by the United States Constitution. As long as standards and conditions regarding voting are reasonable and non-discriminatory, they are permissible. *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *Lassiter v. Northhampton County Board of Elections*, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). If there is no arbitrary or invidious discrimination against or treatment of persons in like circumstances by state action, the federal courts will not sit in judgment upon the wisdom of the policy promoting such action. *Lassiter v. Northhampton County Board of Elections, supra.*

The Court finds no arbitrary or invidious discrimination in the statutory scheme for vote casting and counting in N.C.G.S. 163–151 and 163–170 or in their application. All voters in each individual precinct are treated alike using the same voting methods under the same rules. The rules for casting and counting votes apply the same to each candidate in the individual precincts. The instructions for voting in each precinct are printed on each ballot and a voter can cast his or her vote and have it counted as he or she desires by simply reading and following the instructions. While the write-in vote and the crossover vote after a straight party vote require affirmative acts, the voter in each instance must follow the ballot instructions and the statutory

rules to have his or her vote counted as cast. Under N.C.G.S. 163–170(5), (6) and (7), neither the write-in vote nor the cross-over vote is counted if it is placed in a party column different from the straight party vote. The statutes are applied equally to all voters using the Airmac and CES ballots and to all of the candidates thereon. The Court finds no arbitrary or invidious discrimination violative of the equal protection clause here.

Assuming arguendo that the evidence here shows discrimination the Court then must determine whether such conduct is impermissibly discriminatory in violation of the equal protection clause of the Fourteenth Amendment. In making such determination the Supreme Court has directed the following three factors be examined: "(1) the character of the classification in question; (2) the individual interests affected by the classification; and (3) the governmental interests asserted in support of the classification." *Dunn v. Blumstein*, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972). In the case at bar it is argued that the state statutes infringe upon an individual's right to vote and to have the vote counted as cast. This is a fundamental right and therefore the statutes "must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. at 562, 84 S.Ct. at 1381. To survive the strict scrutiny test, the state encroachment on the right to vote must be justified by a compelling state interest. See *Dunn v. Blumstein, supra.*

Under the Constitution the several states conduct elections and must therefore enact certain laws, rules and regulations governing the registration of voters and the conduct of elections. Historically, our elections have been partisan and usually involve two major political parties. There is nothing impermissibly discriminatory about a state statute or an election procedure for straight party voting. However, a state has no right to require a voter to vote a straight party ticket so arrangements must be made for crossover and write-in voting. The statutes provide for crossover and write-in voting and apply equally to all voters, parties and candidates. The state has a compelling interest in adopting a system of voting which will permit the voters to vote without undue delay; to count the votes within a reasonable time and to prevent fraud and illegal procedures. The Court cannot find from this evidence that the statutes or the procedure used in the election were impermissibly discriminatory in violation of the Fourteenth Amendment.

Plaintiffs next allege that the ballots failed to comply with the statutory requirement set forth in N.C.G.S. 163–140(3)[2] and

**2.** (3) Ballot for Member of the United States House of Representatives:

Beneath the title and general instructions set out in this subsection, the congressional district ballot for member of the United States House of Representatives shall be divided into parallel columns separated by distinct black lines. The State Board of Elections shall assign a separate column to each political party having a candidate for the office and one to unaffiliated candidates, if any. At the head of each party column the party's name shall be printed in large type, and at the head of the column for unaffiliated candidates shall be printed in large type the words "Unaffiliated Candidates." The name of each political party's candidate for member of the United States House of Representatives from the congressional district shall be printed in the appropriate party column, and the names of unaffiliated candidates for the office shall be printed in the column headed "Unaffiliated Candidates." At the left of each name shall be printed a voting square, and in each column all voting squares shall be arranged in a perpendicular line....

On the bottom of the ballot shall be printed an identified facsimile of the signature of the Chairman of the State Board of Elections.

When the ballot for member of the United States House of Representatives is combined with a ballot for another office, below the party name in each column shall be printed a circle, one-half inch in diameter, around which shall be plainly printed the following instruction: "For a straight ticket, mark within the circle." The following instructions, in lieu of those specified in the preceding paragraph, shall be printed in heavy black type on the face of the combined ballot at the top above the party and unaffiliated column division:

"a. To vote for all candidates of one party (a straight ticket), make a cross (X) mark in the circle of the party for whose candidates you wish to vote.

violate the Due Process Clause of the Fourteenth Amendment. These ballots were provided by Defendants County Boards of Elections as directed by and approved by Defendant State Board of Elections. Plaintiffs contend that the ballots were insufficient in the following respects:

1. The ballots were not divided into parallel columns separated by distinct black lines;

2. Separate columns for each political party were not assigned;

3. The Party's name was not printed in large type at the head of each Party column;

4. The ballots did not have printed an identified facsimile of the signature of the Chairman of the State Board of Elections, but rather had the signature of various County Board of Elections officials;

5. No circles one-half inch in diameter were printed on the ballots as combined with the State ballot and the ballots merely noted "Straight Party Ticket," rather than the statutorily required words "For a Straight Ticket, Mark Within This Circle;"

6. The instructions on the face of the combined ballot were not printed in heavy black type as required by statute, but were printed in small and difficult to read type;

7. A misleading notation, not provided for by statute, was placed under the heading for the Congressional District ballot which read "(You may vote for one)" which type was much larger than that in which the general instructions were printed, without any notation that a straight party vote would override the voter's choice;

8. Sample ballots were not prepared or issued in Haywood County.

b. To vote for candidates of more than one party (a split ticket), do not mark in any party circle, but make a cross (X) mark in the square opposite the name of each candidate for whom you wish to vote.

It is well settled that the interests encompassed by the right to vote are among the liberties protected against state infringement by the Due Process Clause. If "the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore is in order." *Griffin v. Burns,* 570 F.2d 1065, 1077 (5th Cir.1978). Again, the inquiry under Sections 1983 and 1985 is whether Plaintiffs have been deprived of a right "secured by the Constitution and laws" of the United States. *Baker v. McCollan, supra.*

As stated previously, the Constitution leaves to the states broad power to regulate conduct of federal and state elections. See generally *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972); *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). The federal courts are neither empowered nor equipped to supervise the administration of elections. *Id.* Further, not every election irregularity gives rise to a constitutional claim cognizable under § 1983. In *Gamza v. Aquirre,* 619 F.2d 449 (5th Cir.1980), the Court of Appeals for the Fifth Circuit set forth general guidelines for determining whether a particular challenge to a state election practice rises to the level of a constitutional violation thereby deserving federal court protection. The Court stated:

... the determination that particular conduct constitutes a constitutional deprivation rather than a lesser legal wrong depends on the nature of the injury, whether it was inflicted intentionally or accidentally, whether it is part of a pattern [sic] that erodes the democratic process or whether it is more akin to a negligent failure properly to carry out the state ordained electoral process and whether state officials have succumbed

c. If you tear or deface or wrongly mark this ballot, return it and get another."

to "temptations to control ... elections by violence and by corruption ..." 619 F.2d at 453 quoting *Ex parte Yarborough,* 110 U.S. 651, 666, 4 S.Ct. 152, 159–160, 28 L.Ed.2d 274, 279 (1884).

Numerous federal courts have refused to become embroiled in tinkering in the details of ordinary disputes over the administration of elections such as the counting and marking of ballots but have reserved their involvement to officially sponsored election procedures that reach the point of patent and fundamental unfairness. *Powell v. Power,* 436 F.2d 84 (2d Cir.1970); *Hennings v. Grafton,* 523 F.2d 861 (7th Cir. 1975); *Pettengil v. Putnam County R–1 School District,* 472 F.2d 121 (8th Cir. 1973); *Hubbard v. Ammerman,* 465 F.2d 1169 (5th Cir.1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973); *Johnson v. Hood,* 430 F.2d 610 (5th Cir. 1970); *Partido Nuevo Progresista v. Barreto Perez,* 639 F.2d 825 ([1st Cir.] 1980), *cert. denied,* 451 U.S 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981).

The Court finds that the differences in the challenged ballots and the requirements of N.C.G.S. 163–140(3) fail to rise to a constitutional level and do not state a violation of the due process clause. There are no deceptions on the ballot to debase the rights of the voters or to confuse the voters. The instructions are located at the beginning of the ballot and are easily readable. The instructions fully set forth the requisite statutory language on straight party/split ticket voting. The instructions explain either 1) that a straight ticket vote will override a split ticket vote and will count as a straight ticket vote or 2) that if you vote a straight ticket then you cannot vote for any other candidate. The congressional portion of the ballot is clearly marked with the candidates separated by parallel horizontal lines. The candidate's political affiliation is located immediately beside the candidate's name and is printed in the same type as the candidate's name. The language "(You may vote for one)" is designed to prevent a voter from marking the ballot for more names than there are positions to be filled and thereby invalidating the vote for that office. See N.C.G.S. 163–170(2). The Court concludes that the alleged technical violations of N.C.G.S. 163–140(3) are at most "lesser legal wrongs" and do not constitute due process deprivations.

Plaintiffs further argue that the application of N.C.G.S. 163–140(3) and 163–170 in counting a straight party vote over a split ticket vote is fundamentally unfair. The Court finds that the statutes and their application in the election did not reach "the point of patent and fundamental unfairness" and thus did not violate due process. The ballot instructions duly set out the rules on how to vote straight party or for individuals (split ticket vote). The instructions are readable and unambiguous. It is the duty of the individual voter to read and familiarize himself or herself with the ballot instructions prior to casting his or her ballot. While there are valid arguments for and against the wisdom of the present statutory rule, it is for the North Carolina General Assembly and not a federal court to determine how a straight party/crossover vote will be counted. The arguments advanced by the Plaintiffs are appealing and if this Court were a member of the General Assembly serious consideration would be given to voting to repeal the 1979 statute. But this Court is not empowered to legislate and can only determine whether the statutes and procedure violate the Constitution and laws of the United States.

The Court holds that there has been no violation of the Voting Rights Acts, 42 U.S.C.A. Sections 1971 and 1973 in this case.

After a careful examination of the evidence and the law the Court finds and concludes that the statutes and the procedure do not violate the Constitution and laws of the United States and must therefore deny the relief demanded by the Plaintiffs. A judgment will be entered dissolv-

ing the injunction staying the certification of the winning candidate and dismissing the Plaintiffs' action.

This the 3rd day of December, 1982.

/s/ Woodrow W. Jones
Chief Judge

APPENDIX B

MEMORANDUM OPINION

*Discussion*

This action is currently before the Court pursuant to an order of remand entered by the United States Court of Appeals for the Fourth Circuit in *Hendon v. North Carolina State Board of Elections,* 710 F.2d 177 (4th Cir.1983). The Court of Appeals set the following parameters for the factual inquiry on remand:

> The district court should also determine whether the CES and Airmac systems can be programmed to accommodate split tickets in substantially the same manner as North Carolina voting machines. If this can be done, the state should be afforded an opportunity to present its reason for treating voters who use voting machines differently from those who use the CES and Airmac systems. With this factual information at hand, the district court should determine whether [N.C.Gen.Stat.] § 163–151(5)(a) is being unconstitutionally applied.

*Id.* 710 F.2d at 183.

*Factual Findings*

Based upon the evidence in the record and the stipulations entered into by the parties on May 17, 1984, the Court makes the following findings of fact:

1. That CES, Airmac, and GDS vote counting machines now approved for use in the State of North Carolina by the defendant North Carolina State Board of Elections can be programmed in substantially the same manner as those Shoup and AVM mechanical voting machines were set and operated during the 1982 General Election in the State of North Carolina to count those ballots on which the voter has marked or punched a straight party ticket and has also marked or punched an individual cross-over vote.

2. That the State of North Carolina offered no evidence that voters who use CES, Airmac, or GDS voting machines should be treated differently from those voters who used mechanical voting machines as they were programmed to operate in the 1982 General Election.

3. That the integrity of elections can be maintained if a dual vote made on any ballot counted on CES, Airmac, or GDS vote counting machines is counted as a vote for the individual candidate whom the voter has designated and all candidates on the designated straight party ticket except the opponent of the individual candidate the voter favors. This recognizes the intent of the voter and is compatible with the counting of votes on mechanical voting machines.

*Conclusions of Law*

Based on the foregoing, the Court finds that N.C.Gen.Stat. § 163–151(5)(a) is unconstitutional as applied under the Fourteenth Amendment to the United States Constitution.

An order will be entered directing the defendants in future general elections to program CES, Airmac, and GDS voting machines in substantially the same manner as those Shoup and AVM mechanical voting machines were programmed and operated during the 1982 General Election in order to count cross-over votes for individual candidates on those ballots on which the voter has marked or punched a straight party ticket and has also marked or punched an individual cross-over vote.

This the 31st day of May, 1984.

/s/ Woodrow W. Jones
United States District Judge

## APPENDIX C

W.M. (Bill) Hendon, Bill Hendon for Congress Committee, Peggy B. Hannah, Individually and on behalf of other voters of the Eleventh Congressional District of N.C., United States Senator Jesse Helms, The North Carolina Republican Party, and David T. Flaherty, Chairman, Appellees,

versus

North Carolina State Bd. of Elections, Robert W. Spearman, Chairman, and Elloree M. Erwin, Ruth T. Semashko, William A. Marsh, Jr., Robert R. Browning, Members of the N.C. State Board of Elections, Haywood County Board of Elections, Jim Francis, Chairman, and Tom Hart, Frank Queen, Members of the Haywood Co. Board of Elections, Henderson County Board of Elections, T.E. Mullinax, Jr., Chairman, Nicholas Semashko, Larry Justus, Members of the Henderson Co. Bd. of Elections, McDowell County Board of Elections, S.R. "Jack" Triplett, Chairman, and Janet N. Norton, Walter W. Bill Rowe, Members of McDowell Co. Board of Elections, Rutherford County Bd. of Elections, James H. Burwell, Chairman, J.D. Cooley, Bill Penson, Members of Rutherford Co. Bd. of Elections, Transylvania Co. Bd. of Elections, John R. Hudson, Chairman, William C. Mann, Henry R. Crais, Members, Transylvania Bd. of Elections, Appellants.

No. 84–1687

United States Court of Appeals,

Fourth Circuit.

Argued Feb. 7, 1985.

Decided July 3, 1985.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Woodrow W. Jones, District Judge. (C/A A–C–82–357)

**1.** N.C.Gen.Stat. §§ 163–151(5)(b) and 170(6)(a) (1982).

Sandra M. King, Assistant Attorney General (Rufus L. Edmisten, Attorney General; James Wallace, Jr., Deputy Attorney General for Legal Affairs; Robert B. Long, Jr., Long, Parker & Payne; James F. Schoener, Miller, Canfield, Paddock & Stone on brief) for Appellants; Thomas A. Farr (Armistead J. Maupin; Charles B. Neely; Maupin, Taylor & Ellis, P.A.; Robert Orr; James F. Schoener; Miller, Canfield, Paddock & Stone on brief) for Appellees.

Before RUSSELL and ERVIN, Circuit Judges, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

PER CURIAM:

This action challenged the constitutionality of certain statutorily mandated election practices and procedures of North Carolina. One of the practices attacked required that a "split ticket" (*i.e.*, one marked generally as a straight party ticket and specifically for an opposing individual candidate) be counted as a straight party ticket.[1] That counting method invalidates the cross-over vote for the opposing individual candidate. The other practice, which related to those voting precincts using either the electronic punch card system (CES) or optically scanned paper ballot system (Airmac) of voting, required a voter who wished to split his ballot to vote for what in some instances were "51 individual candidates." 710 F.2d at 181.[2] It was asserted that such practice, while perhaps facially valid, was, as applied, an unconstitutional burden on such voter violative of equal protection, since voters in the State using either traditional paper ballots or the customary mechanical voting machines suffered no such burden. In an earlier appeal in this case we reviewed these two claims. 710 F.2d 177 (1983).

In the earlier appeal, we held in connection with the plaintiffs' first claim, "the legislative directive to count an improperly split ballot as a vote for the straight party ticket [to be] unconstitutional" because it

**2.** N.C.Gen.Stat. § 163–151(5)(a) (1982).

"den[ied] the equal protection of the laws to both the voter and the opponent of the candidate named on the straight party ticket." 710 F.2d at 181. With reference to plaintiffs' second attack, the Court in that appeal, while recognizing that "[a] state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state," declared:

"A state may not, however, place an onerous burden on voters' exercise of their right to vote, and there must be a rational explanation when it is manifest that a greater burden may be placed upon the voter depending upon the method of voting employed in his voting place." *Id.* (citations omitted).

It accordingly concluded

"that although § 163–151(5)(a) is not facially unconstitutional, it may turn out to be unconstitutionally applied if (a) the CES and Airmac systems can be programmed to record split tickets in substantially the same manner as voting machines and (b) the state offers no rational explanation for requiring voters who are furnished the CES and Airmac systems to suffer a much more onerous burden than voters who are furnished voting machines." [3]

The action was remanded to the district court to determine "whether the CES and Airmac systems [could] be programmed to accommodate split tickets in substantially the same manner as [traditional mechanical] voting machines," thus eliminating any greater burden on a voter using the CES or Airmac system who wished to vote a split ticket than on a voter using the traditional mechanical voting machine or traditional paper ballot and wishing to vote a split ticket.

At the hearing on remand, the district judge stated to the parties that, in his opinion, the only question to be resolved on remand was "whether the CES and Airmac systems can be programmed to accommodate split voting in substantially the same manner as North Carolina's voting machines?" Counsel for the Election Board responded:

"I can't see there could possibly be any need for a hearing on that. I would enter into a stipulation on that."

Later, the counsel for the Board followed with this additional statement, emphasizing the concession she had already made:

"And if I'm willing to stipulate that CES and Airmac can be programmed to accommodate split-ticket voting, with all due respect, I don't see that there are any other issues."

Counsel for the plaintiffs then interpolated:

"Well, Judge, if I understand Mrs. King correctly, and she's saying there is no justification for treating the people on the Airmac and the CES differently than the voting machines, I do think this could be resolved without a hearing. If that's what she's saying.

"Mr. Long: I think that's just what she said.

"Mrs. King: About three times."

The district judge, after remarking that he needed something in the record on which to base his judgment, suggested that the parties enter into a written stipulation in accordance with their concessions made in open court. Such a stipulation was accordingly executed by the parties and included in the record. On the basis of such stipulation, the district judge made these findings of fact:

"1. That CES, Airmac, and GDS vote counting machines now approved for use in the State of North Carolina by the defendant North Carolina State Board of Elections can be programmed in substan-

---

**3.** In Note, *Statutory Preference for Straight Ticket Voting in Counting Crossover Ballots*—Hendon v. North Carolina State Board of Elections, 62 N.C.L.Rev. 1173, 1178 (1984), the writer properly summarizes our earlier ruling on this point thus:

"Recognizing the equal protection problems of varying the difficulty of casting split-ticket votes with the type of machine used, the court of appeals declared that the statute would be unconstitutional as applied if the State were unable to show that the means used were the least burdensome to voters seeking to split their ticket or that some rational state interest justified an added burden."

tially the same manner as those Shoup and AVM mechanical voting machines were set and operated during the 1982 General Election in the State of North Carolina to count those ballots on which the voter has marked or punched a straight party ticket and has also marked or punched an individual cross-over vote.

"2. That the State of North Carolina offered no evidence that voters who use CES, Airmac, or GDS voting machines should be treated differently from those voters who used mechanical voting machines as they were programmed to operate in the 1982 General Election.

"3. That the integrity of elections can be maintained if a dual vote made on any ballot counted on CES, Airmac, or GDS vote counting machines is counted as a vote for the individual candidate whom the voter has designated and all candidates on the designated straight party ticket except the opponent of the individual candidate the voter favors. This recognizes the intent of the voter and is compatible with the counting of votes on mechanical voting machines."

The district judge also arrived at the following conclusions of law:

"Based on the foregoing, the Court finds that N.C.Gen.Stat. § 163–151(5)(a) is unconstitutional as applied under the Fourteenth Amendment to the United States Constitution."

On the basis of these findings and conclusions, he decreed:

"1. N.C.Gen.Stat. §§ 163–151(5)(b), (6)(d), 163–170(5)(d)(2), and (6)(a) are unconstitutional under the Fourteenth Amendment to the United States Constitution.

"2. That the defendants are permanently enjoined from counting as a vote for the straight party ticket all attempts, whether by mark or write-in, to split a ticket.

"3. That N.C.Gen.Stat. § 163–151(5)(a) is unconstitutional as applied under the Fourteenth Amendment to the United States Constitution.

"4. That in future general elections, the defendants will program CES, Airmac, and GDS vote counting machines in substantially the same manner as those Shoup and AVM mechanical voting machines were programmed and operated during the 1982 General Election in order to count cross-over votes for individual candidates on those ballots on which the voter has marked or punched a straight party ticket and has also marked or punched an individual cross-over vote."

We find no error in these findings of fact and conclusions of law of the district judge. However, since oral argument in this case the General Assembly of North Carolina has enacted House Bill 1796, Chapter 1099. The defendants have called this statute to our attention. Since this statute was not before the district court in the proceedings appealed and has not been briefed, we are of opinion that this cause must be remanded to the district court in order that it may consider what effect such statute may have on the issues herein.

Accordingly the cause is remanded to the district court.

REMANDED.

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

| | Circuit Court No. |
|---|---|
| - versus - | District Court No. |
| | ➡ SEE INSTRUCTIONS ON BACK BEFORE COMPLETING FORM |

## BILL OF COSTS

The Clerk is requested to tax the following costs against - ..................................................................................................

| COURT COSTS TAXABLE UNDER RULE 39, FRAP | CLAIMED | TAXED |
|---|---|---|
| Docketing Fee | $ | $ |
| Printing Method:  Photo Reproduction  Printed | | |
| Printing Appendix ........ Pages | | |
| Printing Appellant's Brief ........ Pages | | |
| Printing Appellee's Brief ........ Pages | | |
| Printing Appellant's Reply Brief ........ Pages | | |
| | | |
| TOTAL AMOUNT | $ | $ |

## DECLARATION

I declare under penalty of perjury that the foregoing costs are true and correct and were necessarily incurred in this action. A copy hereof was this day mailed to opposing counsel.

| Date | Signature | (For) Name of Claiming Party |
|---|---|---|
| | | |

## CLERK'S CERTIFICATE OF COSTS

Costs are hereby taxed in the following amount: $........................-

| Date | Clerk of Court  JOHN M. GREACEN | (By) Deputy Clerk |
|---|---|---|
| | | |

# INSTRUCTIONS

A.  Taxation of costs is controlled by the provisions of FRAP 39(a) unless the Court specifically directs otherwise in its decision or by subsequent order.

B. The bill of costs form should be filed within fourteen (14) days after judgment, even if a petition for rehearing or other post-judgment motion is filed. A late bill of costs must be accompanied by a motion for leave to file.

C. Only two general categories of costs are taxable in the Court of Appeals.

    1. The docketing fee is recoverable if the case is reversed. Although a $70 fee is paid, only the $65 appellate docket fee is taxable in this Court.

    2. The costs of printing or reproducing briefs and appendix, including exhibits, can be claimed. To determine taxable amount, the number of pages is counted in a single brief/appendix, including the front cover and any table pages, but excluding the certificate of service page and any addendums which may be attached to the brief. Pursuant to local rule, briefs and appendices shall be taxable as costs at a rate equal to the actual cost, but not higher than $10 per page of standard typographical printing or its equivalent or $4 per page of photographic reproduction of typed material. The printer's itemized statement of charges should accompany this cost form.

D. Although some costs are "taxable" in the Court of Appeals, all costs are recoverable in the district court after issuance of the mandate. In addition, various costs incidental to an appeal must be settled at the district court level. Among such items are: (1) the cost of the reporter's transcript; (2) fee for filing the notice of appeal; (3) fee for preparing and transmitting the record; and (4) the premiums paid for any required appeal bond.

---

## APPENDIX D

N.C.Gen.Stat. §§ 163–151(4), (5), and (6), 163–170(5) and (6) (1982) provide in relevant part:

§ 163–151. *Marking ballots in primary and election.*

The voter shall adhere to the following rules and those instructions printed on the ballot in marking his ballots:

. . . .

(4) Straight Ticket.—In an election, but not a primary, if the voter desires to vote for all candidates of one political party (a straight ticket), he shall either:

    a. Mark the party circle printed above the party column; or

    b. Mark in the voting square at the left of the name of every candidate printed on the ballot in the party column for whom he desires to vote; or

    c. Mark the party circle and also mark some or all names printed in that party column.

(5) Split Ticket.—In an election but not in a primary, if the voter desires to vote for candidates of more than one political party (a split ticket), he shall:

    a. Omit marking in the party circle of any party and mark in the voting square opposite the name of each candidate of any party printed on the ballot for whom the voter wishes to vote.

    b. If the voter should mark the party circle of one party, and also mark the voting square opposite the name of candidates of any other party, the ballot shall be counted as a straight ticket for all candidates of the party whose circle was marked and the individually marked candidates of any other party shall not be counted.

(6) Write-in Votes.—

. . . .

b. The voter should not write in a name of a person whose name appears as a candidate of a political party. If the voter writes in the name of a candidate printed on the ballot of any party, the write-in shall not be counted.

c. If the voter has marked the party circle of one political party, he may also write in the name of a person for whom he wishes to vote beneath the name of a candidate printed in the same column whose party circle he has marked.

d. If the voter has marked the party circle of one party, he should not write in the name of a person under the name of a candidate in any other party. In such case, the write-in shall not be counted, but the ballot shall be counted for all candidates of the party whose circle was marked.

§ 163–170. *Rules for counting ballots.*

. . . .

(5) Write-in Votes.—If a name has been written in on an official general election ballot . . ., it shall be counted in accordance with the following rules:

. . . .

c. If the person whose name was written in appears as a candidate of a political party for any office, the write-in shall be ignored and the ballot shall be counted as though no write-in appeared for such office.

d. Marking Party Circle and Write-Ins.—

1. If the voter marks the party circle above the column in which he has entered the write-in, his ballot shall be counted as a vote for the person whose name has been written in, and for all other candidates of the party in whose circle he has marked, except the candidate beneath whose printed name the write-in appears.

2. If the voter has marked the party circle at the top of the column of a political party, and has made a write-in under the name of a candidate printed in a column of a different political party, the write-in shall not be counted, and the ballot shall be counted as a vote for all candidates of the party in whose circle he has marked.

(6) Split Ticket.—

a. If the voter has marked the party circle of one party and also marked the voting square of individual candidates of another party, the ballot shall be counted as a straight ballot and counted as a vote for every candidate for the party whose circle has been marked.

b. If the voter votes a split ticket by omitting to mark the party circle and marks the voting square opposite the name of candidates for whom he desires to vote in different party columns, the ballot shall be counted as a vote for each candidate marked in a different party column.

APPENDIX E

GENERAL ASSEMBLY OF
NORTH CAROLINA

1983 SESSION (REGULAR
SESSION, 1984)

**RATIFIED BILL**

CHAPTER 1099

HOUSE BILL 1796

AN ACT TO PUT NORTH CAROLINA IN COMPLIANCE WITH A FEDERAL COURT DECISION CONCERNING STRAIGHT TICKET VOTING.

The General Assembly of North Carolina enacts:

Section 1. Notwithstanding any other provision of law, the State Board of Elections is authorized and directed to promulgate all needful rules to bring the State into compliance with the federal court order in civil action A–C–82–357 Western District of North Carolina, Asheville Division and may modify ballot formats, ballot instructions, and counting and tabulating procedures for such purpose. Such rules shall also apply to paper ballots.

Sec. 1.1. When a person voting in a general election marks the party circle of one party and either:

(1) marks the voting square of an individual candidate of another party; or

(2) writes in the name of a person under the name of a candidate of any other party; then the ballot shall be counted as a vote for every candidate of the party whose circle has been marked except candidates of that party for an office where:

(1) an individual candidate of another party has been marked; or

(2) a name of a person has been written in under the name of a candidate of any other party;

and in such cases, no vote of that voter for that office shall be counted.

Sec. 1.2. Notwithstanding any other provision of law, the State Board of Elections is authorized and directed to promulgate all needful rules to comply with Section 1.1 of this act, including modifying ballot formats, ballot instructions, and counting and tabulating procedures for such purpose.

Sec. 2. Rules made under Section 1 of this act shall only apply to elections held before March 1, 1985. Sections 1.1 and 1.2 of this act shall become effective March 1, 1985, and apply to elections held on or after that date.

Sec. 3. This act is effective upon ratification.

In the General Assembly read three times and ratified, this the 6th day of July, 1984.

JAMES C. GREEN
James C. Green
President of the Senate

LISTON B. RAMSEY
Liston B. Ramsey
Speaker of the House of Representatives

APPENDIX F

WHEREAS, the case of *Hendon, et al. v. N.C. State Board of Elections,* was filed in November of 1982; and

WHEREAS, the issue in the *Hendon* case concerns the proper procedure for handling crossover votes (votes marked for individual candidates on a ballot also marked for the straight ticket vote·of a party opposite to the party of the individual candidates); and

WHEREAS, the procedure for handling crossover votes in House Bill 1796, Chapter 1099, is exactly the same as the procedure proposed by the State Board of Elections on 17 May 1984 during a hearing before the United States District Court for the Western District of North Carolina; and

WHEREAS, the United States District Court for the Western District of North Carolina entered an opinion and judgment on 7 June 1984 rejecting on constitutional grounds the procedure proposed by the State Board of Elections during the hearing of 17 May 1984 and instead ordered the State to honor voter intent by counting crossover votes on ballots also marked for a straight ticket vote; and

WHEREAS, the United States Court of Appeals for the Fourth Circuit entered an opinion on 3 July 1985 in which it found no error in the findings of facts or conclusions of law entered by the District Court on 7 June 1985; and

WHEREAS, the United States Court of Appeals for the Fourth Circuit has now remanded the *Hendon* case to the District Court solely to give that Court the first opportunity to rule on the constitutionality of House Bill 1796, Chapter 1099; and

WHEREAS, all issues related to the constitutionality of House Bill 1796, Chapter 1099, have already been decided by the District Court in its opinion and judgment of 7 June 1984 given the fact that the procedure for handling crossover votes in House Bill 1796, Chapter 1099 is identical to the procedure proposed by the State Board of Elections on 17 May 1984 and rejected by the District Court on 7 June 1984;

IT IS RESOLVED that the State Board of Elections will direct its Executive Director to inform the Attorney General for the State of North Carolina to forthwith appear for the United States District Court

for the Western District of North Carolina and confess judgment that House Bill 1796, Chapter 1099, is unconstitutional under the Fourteenth Amendment to the United States Constitution.

Adopted on August 8, 1985 upon motion by Mr. Browning, second by Mrs. King with Browning, King and Hunter voting AYE; Marsh and Semashko voting NAYE.

Recorded:

/s/ Alex K. Brock
Executive Secretary-Director

The undersigned executive officer of the North Carolina State State Board of Elections certifies this document to be a true and exact copy of Resolution adopted on 8 August 1985 as hereinabove specified.

/s/ Alex K. Brock
Executive Secretary-Director

28 August 1985.

### JUDGMENT AND ORDER

Pursuant to the directions heretofore given to this Court by the United States Court of Appeals for the Fourth Circuit in *Hendon v. North Carolina State Board of Elections*, 710 F.2d 177 (4th Cir.1983); and for the reasons set forth in the Memorandum of Opinion filed simultaneously herewith;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That plaintiffs' motion for summary judgment is allowed.

2. That North Carolina Statute designated House Bill 1796, Chapter 1099, Session Laws of 1983 (Regular Session 1984) is unconstitutional under the Fourteenth Amendment to the United States Constitution.

3. That defendants are permanently enjoined from counting as a vote for the straight-party ticket all attempts, whether by mark, write-in, or the use of any voting machine authorized by the state, to split a ticket.

4. That in future general elections, the defendants will program all vote-counting machines used in the state in order to count crossover votes for individual candidates on those ballots on which the voter has marked or punched a straight-party ticket and has also marked or punched an individual crossover vote, and will count all paper ballots similarly marked in the same manner, for such individual candidates.

5. That all other provisions of the judgment of this Court signed by the Honorable Woodrow W. Jones on the 31st day of May, 1984, remain in effect.

### SUPPLEMENTAL MEMORANDUM OF OPINION

After the Court rendered its decision in this matter on the 16th day of April, 1986, the Court received a letter from the Honorable James G. Martin, Governor of North Carolina, copy of which is attached hereto as Exhibit A. The Court notes that copies of the communication were directed to all counsel in the cause. This letter prays that the Court reexamine the issue addressed by the Court in Section I of the prior opinion. Although Governor Martin is not a party to this action, and even were he a party the request contained in his communication is obviously addressed to the discretion of the Court, the Court nonetheless has reviewed Section I of the prior opinion but declines to recall or modify that section for the following reasons:

1. The issue addressed in Section I of the prior opinion was not determinative of the case in any fashion. The Court addressed the question of the attorney general's power vis-a-vis a client agency for the reason that the plaintiffs' view of that issue was offered as a basis for the granting of summary judgment in favor of plaintiffs. Since the Court did not share that view, the Court felt it necessary to dispel any appellate court or future readers' misapprehensions as to the basis of the Court's allowance of the motion for summary judgment. Nonetheless, the resolution of Section I being unnecessary to the resolution of the questions before the Court, the language contained therein is merely *dicta* and not binding authority upon anyone.

*Estate of Goldstein v. C.I.R.,* 479 F.2d 813, 816 (10th Cir.1973).

 2. Governor Martin's concern seems to be the precedential effect of this opinion as to controversies between the governor (or other state agencies) and the attorney general. To attempt to resolve that question at this stage would be to render an advisory opinion which this Court is bound not to do. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

3. Upon review of Section I of the prior opinion, this Court does not feel its language to have been in any way erroneous therein.

Therefore, the Court will take no action in relation to the request of Governor Martin.

EXHIBIT A

STATE OF NORTH CAROLINA

OFFICE OF THE GOVERNOR

RALEIGH 27611

April 25, 1986

JAMES G. MARTIN

GOVERNOR

The Honorable David Sentelle
United States District Judge
Post Office Building
Asheville, North Carolina 28801

RE: CV–A–C–82357; Hendon, et al. vs. N.C. State Board of Elections, et al.

Dear Judge Sentelle:

My Counsel have briefed me concerning the Memorandum of Opinion entered by you in the captioned action and reported to me on their visit with you April 25, 1986.

The issue addressed by you in Section I of your Opinion is a constitutional issue of paramount importance to the functioning of State Government. Because I am concerned that in subsequent actions in State Court in which the same issues may be raised that your opinion may be cited as standing for propositions broader than were intended, I respectfully request that you consider supplementing your Memorandum of Opinion with clarifying language to make clear that you intended for the Opinion to apply only to the State Board of Elections and not to any other State Agencies or the Office of the Governor.

Thank you for your consideration, I am,

> Sincerely,
> /s/ James G. Martin
> James G. Martin

cc: The Honorable Lacy Thornburg
   James Wallace, Esquire
   Thomas Farr, Esquire